BOLEDOVICS *v.* HIMICH.

1. DEEDS—SETTING ASIDE—FINDING OF COURT—WILLS—WITNESSES
—EVIDENCE.
  Finding of trial court that plaintiffs, an elderly Hungarian
  couple, to the effect that they thought they were signing a will
  rather than executing quitclaim deed wherein they reserved
  a life estate and which they are seeking to set aside, is not
  disturbed, where evidence on such matter is conflicting, and
  trial court could see and hear the witnesses and appraise their
  testimony as they spoke through an interpreter.

2. SAME—CANCELLATION—MISTAKE OF LAW.
  Cancellation of a deed will be afforded by court of equity where
  it fails to express the real contract which the parties entered
  into by reason of a mistake of law.

Appeal from Genesee; Gadola (Paul V.), J.
Submitted January 3, 1956. (Docket No. 10, Calendar No. 46,599.) Decided March 1, 1956.

Bill by Gust Boledovics and Irene Boledovics
against Helen Himich and others to set aside deed.
Decree for plaintiffs. Defendants appeal. Affirmed.

*Dale C. Showley* (*Dale A. Riker,* of counsel), for
plaintiffs.

*Vincent D. Ryan,* for defendants.

SHARPE, J. This is a chancery action to set aside
a deed dated February 23, 1952, and recorded March

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 16 Am Jur, Deeds §§ 43–45.

3, 1952, in the office of the register of deeds for Genesee county, Michigan.

The essential facts are as follows: Gust Boledovics, also known as Gus Boledovics, hereinafter referred to as Gust Boledovics, and Irene Boledovics were married in 1907. As a result of this marriage 4 children were born, namely, Steve Boledovics, also known as Stephen Boledovics, also known as Stephen P. Baldwin, Mary Horvath, Helen Himich and Rosie Bodnar. Mary Horvath died and left 2 children, Michael and Steve Horvath. In 1944 Gust Boledovics and his wife Irene purchased the property involved in this case. In July, 1951, Irene Boledovics died, and about 5 months later Gust Boledovics married Theresa Boledovics. Gust Boledovics and his wife Theresa are elderly people. Gust Boledovics is unable to understand, read or write the English language, and Theresa Boledovics has a limited understanding of the English language, but is unable to read or write in English. They are of Hungarian descent.

It appears that shortly after Gust Boledovics' second marriage, he and his present wife discussed methods of disposing of their property when they were no longer here to use it. They concluded that the property should go to Gust Boledovics' children and grandchildren. To effectuate this conclusion, they, in February, 1952, consulted a lawyer in Flint, Michigan. They were taken to the office of Miss Elza Papp, who also speaks Hungarian, and she discussed the problem with plaintiffs. They consulted with the lawyer on 3 separate occasions, and on February 23, 1952, a quitclaim deed was executed which contained the following:

"KNOW ALL MEN BY THESE PRESENTS: That Gust Boledovics and Theresa Boledovics, his wife, convey and quitclaim to Helen Himich, Rosie Bodnar and Steve Boledovics, an undivided one-fourth (1/4) in-

terest, and the remaining one-fourth interest to Michael Horvath and Steve Horvath in equal shares, 1538 Montana avenue, Flint, Michigan, the following described premises situated in the city of Flint, county of Genesee and State of Michigan, to-wit:

"Lot 458 Homedale Subdivision, according to the recorded plat thereof.

"Subject, however, to the grantors Gust Boledovics and Theresa Boledovics, reserving unto themselves life tenancies

"for the sum of One Dollar and other valuable consideration."

On September 17, 1953, plaintiffs filed a bill of complaint in the circuit court of Genesee county in which the following allegations were made:

"Plaintiffs further show that at the insistence of the children of Gust Boledovics, also known as Gus Boledovics, one of the above-named plaintiffs, they were induced, on February 23, 1952, to make out what they thought was a will, which was prepared and executed by a local attorney, when, in fact, the same was a quitclaim deed granting title to said above-described real estate to the defendants herein, reserving to the plaintiffs herein a life interest, a copy of which quitclaim deed is attached hereto and made a part hereof.

"Plaintiffs further show that due to their inability to read the English language, or understand the same, they were induced by certain fraudulent representations made to them by said attorney and the defendants herein to execute the deed, believing at the time that they were executing a will.

"Plaintiffs further show that it has been only recently that they found out that they had in fact executed a deed to their property rather than a will, and have asked the defendants herein to reconvey the same to them, which has been refused.

"Plaintiffs further show that there was no consideration whatsoever for the execution of the said deed."

Defendants filed an answer to the bill of complaint in which they deny the allegations above mentioned in plaintiffs' bill of complaint, and further assert that it was the intention of plaintiffs that the defendants should be the owners of the real estate subject to a life interest in the plaintiffs.

The cause came on for trial, at which time both plaintiffs testified that they went to the lawyer's office to have a will made out. Gust Boledovics, through an interpreter, testified:

"*Q*. Did she explain what they were?

"*A*. She just said they were wills, and that is what he wanted, he says.   *   *   *

"*Q*. Ask him at the time he signed them whether or not he had to raise his right hand and swear that he executed them under his free act and deed.

"*A*. There was nothing said to him, just said that 'You are making out a will.'"

Theresa Boledovics, through an interpreter, testified:

"*Q*. What did you think you were in Miss Papp's office for?

"*A*. She said they were making out a will."

At the conclusion of plaintiffs' case, defendants' attorney made a motion for judgment for defendants as follows:

"*Mr. Ryan:* If the Court please, I would move you at this time for a judgment for the defendants for the reason that no case has been made out. There certainly hasn't been any fraud or undue influence on the part of these defendants, and the attorney who made it, drafted the papers, isn't a party to the suit, and the suit is based upon fraud in the making of the deeds and they are made, on the face of them they are proper, properly witnessed; they have been signed. As I say, I don't know, so far as any consideration is concerned, the court is aware of the

*Flood Case.** I would move you for a judgment for the defendants."

The trial court denied the motion, whereupon defendants called Miss Elza Papp as a witness. She testified:

"I had Mr. Nickson come in, and while Mr. Boledovics and his wife were there, and in the presence of my sister, Miss Papp, and Mr. Nickson, I had told them what they were doing. I says, 'Now, this is a deed, and it has to be sworn under oath,' and Mr. Nickson asked me to ask them, because he could not speak Hungarian, if this was what they wanted to do, and I don't know the word for 'free will,' but in Hungarian I ask them if this is really what they wanted to do, in Hungarian, and if they were doing it without any pressure, and they said 'yes', and Mr. Nickson said, 'All right,' and they proceeded to sign this in front of Mr. Nickson, my sister and myself, and when their signatures,—when his signature and her mark was put on, Mr. Nickson then signed it as notary.   *   *   *

"A. Oh, yes, I had explained it to them before Mr. Nickson even came, I took each one of these deeds, and read them to them. In other words, I didn't read them in English because I knew they wouldn't understand. I took and I explained it to them in Hungarian that it was going from the 2 of them to me, covering this property, and I would deed it then back to them, and they in turn would deed it to the 4 children, as they wanted, each of them in equal shares, with the exception of the 2 grandchildren was to get the 1 share of the deceased's daughter, and then I would take it down and have it recorded for them, if that is what they wanted. It was all explained to them."

At the conclusion of all evidence, the trial court held that plaintiffs were entitled to a decree setting aside the quitclaim deed. In an opinion the trial court stated:

---

* See *Flood* v. *Flood,* 295 Mich 366.—REPORTER.

"In this matter it is, of course, very apparent that the plaintiffs here are uncultured, not understanding even the English language, neither can read or write, and the wife, Theresa, is unable to even sign her own name. They have no understanding of business transactions, and therefore all of their transactions must be carefully scrutinized, if it is against their interests. From the testimony given here it is understandable that they had no understanding of the exact import of the transactions they were entering into, even though the attorney that drew up the deeds in question might have attempted to explain to them what the effect was. Primarily transactions of this kind usually end up in some form of discord when the parties begin to realize exactly what they have done."

Defendants appeal and urge that the trial court was in error in setting aside the deed.

It is to be noted that the trial court did not make a specific finding that defendants were guilty of fraud in securing the deed in question, but did find in effect that there was no meeting of the minds on the transaction involved in this case. There is testimony on the part of defendants that plaintiffs understood they were signing a deed, and there is likewise testimony on the part of plaintiffs that they understood they were signing a will. At this stage of the case we have a disputed question of fact upon which the trial court made a finding. There is competent evidence to support the finding of fact of the trial court. It appears to us that this is a case where the trial court had the advantage of seeing and hearing the witnesses and thereby had the advantage of appraising the value of their testimony. Under these circumstances we shall accept the finding of fact of the trial court to the effect that plaintiffs thought they were signing a will rather than executing a quitclaim deed.

In our opinion, decision in this case is controlled by *McGraw* v. *Muma,* 164 Mich 117. In that case a

bill of complaint was filed to set aside and declare void 2 deeds of real estate which a mother executed in favor of her daughter. The basis of the bill of complaint was that the mother, by reason of ill health and mental derangement, was wholly incompetent to transact any business. The trial court did not find the mother mentally incompetent on the day the purported deeds were executed, but the trial court did find as a fact that the mother never desired or intended to sign any paper except one which would leave both the title and use of the property in herself so long as she lived, and that she gave her assent to the instruments under misapprehension of their legal effect. The trial court set aside the conveyances, and in affirming his decree, we quoted with approval (pp 119, 120) from 2 Pomeroy's Equity Jurisprudence (3d ed), §§ 843, 845, as follows:

" 'If an agreement or written instrument or other transaction expresses the thought and intention which the parties had at the time, and in the act of concluding it, no relief, affirmative or defensive, will be granted with respect to it upon the assumption that their thought and intention would have been different if they had not been mistaken as to the legal meaning and effect of the terms and provisions by which such intention is embodied or expressed, even though it should be incontestably proved that their intention would have been different if they had been correctly informed as to the law.'

" 'If, on the other hand, after making an agreement, in the process of reducing it to a written form, the instrument, by means of a mistake of law, fails to express the contract which the parties actually entered into, equity will interfere with the appropriate relief, either by way of defense to its enforcement, or by cancellation, or by reformation to the same extent as if the failure of the writing to express the real contract was caused by a mistake of fact. In this instance there is no mistake as to the legal import

of the contract actually made; but the mistake of law prevents the real contract from being embodied in the written instrument.'"

In the case at bar we are satisfied that the trial court rightly concluded that plaintiffs did not intend to execute the deed in question, and that its effect was not understood by them.

The decree is affirmed, with costs.

DETHMERS, C. J., and SMITH, REID, BOYLES, KELLY, CARR, and BLACK, JJ., concurred.